## LM v STATE OF MICHIGAN

Docket Nos. 317071, 317072, and 317073. Submitted May 7, 2014, at
     Detroit. Decided November 6, 2014, at 9:10 a.m. Leave to appeal
     sought.

Eight minor plaintiffs—LM, SD, MS, LB, DF, ID, FC, and CM,
     through their respective next friends—brought an action in the
     Wayne Circuit Court against the state of Michigan, the State
     Board of Education, the Department of Education, the state
     Superintendent of Public Instruction (together, the state defen-
     dants), and the Highland Park School District, the Highland Park
     School District Emergency Manager, the Highland Park Public
     School Academy System, and Leona Group, LLC. Plaintiffs as-
     serted that they had received inadequate and deficient instruction
     in the Highland Park public schools, resulting in their failure to
     obtain basic literacy skills and reading proficiency as required by
     the state. Defendants moved for summary disposition. The court,
     Marvin Stempien, J., granted summary disposition in favor of
     defendants with regard to plaintiffs' Equal Protection Clause
     claims, but otherwise denied defendants' motions for summary
     disposition. The state defendants appealed the denial of their
     motion for summary disposition to the extent it was based on
     governmental immunity in Docket No. 317071 and separately
     sought leave to appeal the remainder of the court's order in Docket
     No. 317072. The Highland Park School District and Highland Park
     School District Emergency Manager (the district defendants)
     sought leave to appeal the denial of their motion for summary
     disposition in in Docket No. 317073. The Court of Appeals granted
     the applications for leave to appeal and consolidated the appeals.

     The Court of Appeals held:

     1. Under MCL 141.1572 of the Local Financial Stability and
     Choice Act, a cause of action against the state, any officer or
     employee of the state acting in his or her official capacity, or any
     membership of a receivership transition advisory board acting in
     his or her official capacity, may not be maintained for any activity
     authorized by the act. The Legislature's use of the phrases "under
     this act" and "of this act" in the statute denotes restriction of
     liability to the specific provisions of the act, and could not be, as

suggested by the state defendants, construed to encompass other statutory provisions. Although any approvals provided by the state and district defendants of an educational plan by and through the appointment of an emergency manager might be a proper subject for immunity under MCL 141.1572, plaintiffs' claims of constitutional and separate statutory violations were not encompassed.

2. With regard to whether defendants were otherwise entitled to immunity, the general rule is that governmental immunity is not available in a state court action when it is alleged that the state violated a right conferred by the state constitution. Plaintiffs' constitutional claims were premised on Const 1963, art 8, §§ 1 and 2. Section 1 states that the means of education shall forever be encouraged, and § 2 states that the Legislature shall maintain and support a system of free public elementary and secondary schools, as defined by law, and that every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color, or national origin. Section 1 encourages education, but does not mandate it. And the State Board of Education is part of the executive, not legislative, branch of government. Therefore, it is not a part of the branch of government referred to in § 2. Because the cited constitutional provisions did not support plaintiffs' constitutional claims, the trial court should have granted summary disposition in favor of defendants with regard to those claims.

3. MCL 380.1278(8) provides that, excluding special education pupils, pupils having a learning disability, and pupils with extenuating circumstances as determined by school officials, a pupil who does not score satisfactorily on the fourth- or seventh-grade Michigan Educational Assessment Program (MEAP) reading test shall be provided special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months. The statute leaves the determination of students identified as deficient for school officials, indicating decision-making at the local level, which is consistent with other Michigan statutes that indicate the state's role is only to provide general oversight. Therefore, MCL 380.1278(8) did not impose a duty on the state defendants to directly provide services for students who did not perform satisfactorily on the MEAP reading test. The district defendants did have certain duties under the statute, but plaintiffs' pleadings were sufficient with regard to only two of the named plaintiffs, it remained to be determined whether those students were subject to exclusion from the additional instruction requirements because of extenuating circumstances, and while the form of the additional instruction provided to those students

might be deemed insufficient given their lack of progress, that would constitute a separate claim. The statute also contained no express authorization permitting a private cause of action against the school district, so a private cause of action for monetary damages could not be brought. And plaintiffs were not entitled to a writ of mandamus because the school district was afforded wide-ranging discretion to identify the qualifying students and to determine the appropriate method of instruction. Given the lack of a remedy specified by the statute, its enforcement was not a matter for the courts, but rather an administrative matter better resolved between the individuals seeking to obtain services and the relevant school district. The dispute was nonjusticiable in nature because its resolution would have necessitated undue intrusion on other branches of government and would have required the courts to act in areas outside of their judicial expertise.

Reversed and remanded for entry of judgment in favor of the state and district defendants.

MURRAY, P.J., concurring, joined Judge JANSEN's opinion and wrote separately to address the more specific arguments put forth by plaintiffs. Plaintiffs constitutional arguments were not anchored in the text of Const 1963, art 8, §§ 1 or 2. There is no constitutional right to specific educational results in the text of Michigan's Constitution. To the extent that other states have concluded that their state constitutions guarantee a minimal level of education, those decisions were controlled by the particular wording of those states' constitutional provisions. Words like "sufficient," "adequate," or "quality" cannot be read into the Michigan Constitution's general, aspirational language concerning education. The Michigan Constitution gives the Legislature the authority to define the public education to be provided by school districts. It has done so through statutes such as MCL 380.1278(8). But mandamus is not an appropriate way to enforce MCL 380.1278(8) because of the discretion required to implement that statute. Judges are not equipped to decide matters of educational policy. The constitutionally appropriate forum for plaintiffs to seek redress is at the ballot box.

SHAPIRO, J., dissenting, concluded that the use of the term "shall" in Const 1963, art 8, §§ 1 and 2, rendered those provisions mandatory and subject to enforcement by the courts. In the majority's view, there are no minimal constitutional requirements to maintain and support. Rather, the requirement that a school district provide education is met by the mere existence of the school district. But prior Michigan caselaw makes clear that when public educational services fall below a minimal level, Const 1963,

art 8, § 2 is violated. For the educational provisions of the
Constitution to have any meaning, schools must provide adequate
educational services to all children. A review of the caselaw from
other states that have considered this question demonstrates that
the majority here stands nearly alone in its conclusions. Most
states that have addressed the question have held that a cause of
action may be brought and argued, and that a court may find, that
the state has failed to satisfy a constitutional education clause
when the state has failed to provide an adequate education to its
children. The contrary result reached in Iowa is distinguishable
given that the Iowa constitution does not assure a right to a free
public education and, in fact, does not even contain the word
"education." MCL 380.1278(8) also contains the word "shall" and
is, therefore, mandatory. The district defendants did not dispute
that a majority of the relevant students did not score satisfactorily
on the reading test and, thus, essentially conceded that they had
violated the plain terms of the statute. Contrary to the majority's
assertion, the fact that it remains to be determined whether some
of the plaintiffs might be subject to the exclusion-from-additional-
instruction requirement because of extenuating circumstances is
not a proper basis for reversing the trial court's denial of summary
disposition. And also contrary to the majority's conclusion, a
private cause of action may be inferred from MCL 380.1278(8).
The majority wrongly declined to enforce the education policy
enacted by the Legislature. With regard to plaintiff's statutory
claim, the remedy would be straightforward if plaintiffs were to
prevail at trial. Defendants would be ordered to provide the
services specified in the statute, and a writ of mandamus would be
available to direct that action. A writ will lie to require a body
charged with a duty to take action notwithstanding the fact that
execution of the duty may involve some measure of discretion.
While defining a judicial remedy for the constitutional claims
might have posed challenges, those challenges would not have
been insurmountable, and the mere existence of those challenges
did not provide a reason to refuse to hear the case. At minimum, a
declaratory judgment or injunction directing compliance with the
law would have been within the judiciary's purview.

1. GOVERNMENTAL IMMUNITY — LOCAL FINANCIAL STABILITY AND CHOICE ACT —
   ACTIVITIES AUTHORIZED BY THE ACT.

   Under MCL 141.1572 a cause of action against the state, any officer
   or employee of the state acting in his or her official capacity, or any
   membership of a receivership transition advisory board acting in
   his or her official capacity, may not be maintained for any activity
   authorized by the Local Financial Stability and Choice Act; the

restriction of liability only applies with regard to activities authorized by the act and cannot be construed to encompass activities authorized by other acts.

2. CONSTITUTIONAL LAW — EDUCATION.

Const 1963, art 8, § 1 states that the means of education shall forever be encouraged, but it contains no specific mandate; Const 1963, art 8, § 2 states that the Legislature shall maintain and support a system of free public elementary and secondary schools, as defined by law, and that every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color, or national origin; while § 2 requires the state to provide for and finance a system of free public schools, the delivery of educational services is left to local school districts.

3. STATUTES — REVISED SCHOOL CODE — READING SKILLS — SPECIAL ASSISTANCE.

MCL 380.1278(8) provides that, excluding special education pupils, pupils having a learning disability, and pupils with extenuating circumstances as determined by school officials, a pupil who does not score satisfactorily on the fourth- or seventh-grade Michigan Educational Assessment Program (MEAP) reading test shall be provided special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months; the statute leaves the determination of students identified as deficient for local school officials and does not impose a duty on the state to directly provide services for students who do not perform satisfactorily on the MEAP reading test; a private cause of action for monetary damages may not be brought under MCL 380.1278(8) and mandamus is not an appropriate remedy for a violation of the statute.

*Kary L. Moss, Michael J. Steinberg, Mark P. Fancher, Shana E. Schoem, Mark D. Rosenbaum,* and *David B. Sapp, Nacht, Roumel, Salvatore, Blanchard & Walker, PC* (by *Jennifer B. Salvatore, Edward Alan Macey,* and *Nakisha N. Chaney*), and *Wilson Sonsini Goodrich & Rosati, PC* (by *Steven D. Guggenheim, Joni Ostler,* and *Doru Gavril*), for plaintiffs.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Matthew Schneider*, Chief Legal Counsel, and *Darrin F. Fowler* and *Katherine Bennett*,

Assistant Attorneys General, for the state of Michigan, the State Board of Education, the Michigan Department of Education, and the Superintendent of Public Instruction.

*Kienbaum Opperwall Hardy & Pelton, PLC* (by *Noel D. Massie* and *Eric J. Pelton*), for the Highland Park School District and the Highland Park School District Emergency Manager.

Before: MURRAY, P.J., and JANSEN and SHAPIRO, JJ.

JANSEN, J. In Docket No. 317071, defendants state of Michigan, State Board of Education, Michigan Department of Education, and state Superintendent of Public Instruction (hereinafter "the state defendants") appeal by right the denial of their motion for summary disposition, which was based on governmental immunity. In Docket No. 317072, the state defendants appeal by leave granted the same order, denying in part the remainder of their motion for summary disposition. In Docket No. 317073, defendants Highland Park School District and Highland Park School District Emergency Manager (hereinafter "the district defendants") appeal by leave granted that same order, denying in part their motion for summary disposition and an amended scheduling order. We reverse and remand for entry of judgment in favor of the state and district defendants.

This litigation arises from a complaint filed by the American Civil Liberties Union ("ACLU") on behalf of eight minor plaintiffs, who are students in Highland Park, asserting plaintiffs received inadequate and deficient instruction from the Highland Park public schools. According to plaintiffs, this inadequate and deficient instruction has resulted in their failure to obtain basic literacy skills and reading proficiency as

required by the state. Specifically, plaintiffs sought special assistance in accordance with MCL 380.1278(8), premised on their demonstrated lack of proficiency on the reading portion of the standardized Michigan Educational Assessment Program ("MEAP") test.

The state defendants argue that the trial court erred by denying their motion for summary disposition based on governmental immunity. We review de novo the trial court's grant or denial of summary disposition. *Wilson v King*, 298 Mich App 378, 381; 827 NW2d 203 (2012).

The state defendants assert that they were entitled to immunity premised on MCL 141.1572,[1] which states:

> This act does not impose any liability or responsibility in law or equity upon this state, any department, agency, or other entity of this state, or any officer or employee of this state, or any member of a receivership transition advisory board, for any action taken by any local government under this act, for any violation of the provisions of this act by any local government, or for any failure to comply with the provisions of this act by any local government. A cause of action against this state or any department, agency, or entity of this state, or any officer or employee of this state acting in his or her official capacity, or any membership of a receivership transition advisory board acting in his or her official capacity, may not be maintained for any activity authorized by this act, or for the act of a local government filing under chapter 9, including any proceeding following a local government's filing.

Specifically, the state defendants argue that this statutory provision, part of the Local Financial Stability and Choice Act, MCL 141.1541 *et seq.*, is applicable because plaintiffs' claims are premised on the state's liability through appointment of an emergency manager for the Highland Park schools. We note that the immunity

---

[1] 2012 PA 436, § 32, effective March 28, 2013.

provision contained in MCL 141.1572 is, in accordance with MCL 141.1544(6), applicable to any acts or failures occurring under any predecessor emergency manager laws as well.

In support of their assertion, the state defendants cite three paragraphs of plaintiffs' amended complaint, which consists of 125 separate, numbered paragraphs of allegations. Plaintiffs' original and amended complaints assert state responsibility for the failure to provide a bare or minimal level of education as allegedly mandated by Article 8 of the Michigan Constitution and adequate remedial services as delineated in MCL 380.1278(8). While plaintiffs allege that the state and district defendants have attempted to delegate responsibility for the provision of educational services to the district defendants through the operation of charter schools, plaintiffs do not suggest that establishment of an emergency manager is the basis for the litigation. Rather, plaintiffs repeatedly assert several diverse bases for liability of the state defendants, including Const 1963, art 8, §§ 1, 2, and 3; MCL 380.1278(8); MCL 16.400 *et seq.*; and MCL 388.1009 *et seq.* They have denied that their complaint arises from or is dependent upon the imposition of an emergency manager for the school district. Plaintiffs' allegations indicate the existence of the alleged educational and service deficiencies long before the imposition of the emergency manager.

The trial court was partially correct in its denial of summary disposition premised on immunity under MCL 141.1572. The stated purpose of the Local Financial Stability and Choice Act is "to safeguard and assure the financial accountability of local units of government and school districts . . . ." 2012 PA 436, title. Given the financial purpose of the act, it is difficult to sustain the state defendants' contention that it is applicable to all

actions undertaken by an emergency manager or those entities associated with him or her, involving the violation of any other statutory provisions not specifically encompassed within the act, such as MCL 380.1278(8). At the outset, MCL 141.1572 specifically limits imposition of liability "for any action taken by any local government *under this act*, for any violation of the provisions *of this act* by any local government, or for any failure to comply with the provisions *of this act* by any local government." (Emphasis added.) While an emergency manager is authorized by MCL 141.1551(1)(e) to include in a "financial and operating plan" "an educational plan" for school districts, MCL 141.1554 suggests that the role is financial in nature, encompassing the negotiation of contracts, disbursement of funds, reductions in class schedules, closing of schools, and related actions.

In *Tellin v Forsyth Twp*, 291 Mich App 692, 700-701; 806 NW2d 359 (2011), this Court recognized:

> A court must give effect to the Legislature's intent when construing a statute. In determining the Legislature's intent, this Court first looks at the language of the statute itself. This Court gives the words of the statutes their plain and ordinary meaning and will look outside the statutory language only if it is ambiguous. "The Legislature is presumed to be familiar with the rules of statutory construction and, when promulgating new laws, to be aware of the consequences of its use or omission of statutory language . . . ." In determining the plain meaning of the statute, this Court uses the "fair and natural import of the terms employed" and gives effect "to every word, phrase, and clause" as far as possible. [Citations omitted.]

The Legislature's use of the phrases "under this act" and "of this act" denotes restriction of liability to the specific provisions of the Local Financial Stability and Choice Act and cannot be construed, as suggested by

the state defendants, to encompass a completely separate statutory provision, MCL 380.1278(8). Therefore, although any approvals provided by the state and district defendants of an educational plan by and through the appointment of the emergency manager and system defendants may be a proper subject for immunity under MCL 141.1572, claims of constitutional and separate statutory violations are not encompassed.

The question, then, is whether the state defendants are otherwise entitled to governmental immunity. To answer this question, we must first determine whether plaintiffs have stated a cause of action arising directly from the Michigan Constitution or MCL 380.1278(8).

As this Court stated in *Co Road Ass'n of Mich v Governor*, 287 Mich App 95, 121; 782 NW2d 784 (2010):

> As a general rule, " 'governmental immunity is not available in a state court action where it is alleged that the state violated a right conferred by the state constitution.' " *Jones v Powell*, 227 Mich App 662, 673; 577 NW2d 130 (1998), aff'd 462 Mich 329; 612 NW2d 423 (2000), quoting *Marlin v Detroit*, 177 Mich App 108, 114; 441 NW2d 45 (1989). See also *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987) ("Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action.").

Specifically, "[T]he state will be liable for a violation of the state constitution only in cases where a state custom or policy mandated the official's or employee's actions." *Reid v Michigan*, 239 Mich App 621, 629; 609 NW2d 215 (2000); see also *Carlton v Dep't of Corrections*, 215 Mich App 490, 504-505; 546 NW2d 671 (1996). As this Court explained in *Burdette v Michigan*, 166 Mich App 406, 408-409; 421 NW2d 185 (1988), citing *Smith*, 428 Mich 540:

> Governmental immunity is not available in a state court action where it is alleged that the state has violated a right conferred by the Michigan Constitution. . . . [D]efendant cannot claim immunity where the plaintiff alleges that defendant has violated its own constitution. Constitutional rights serve to restrict government conduct. These rights would never serve this purpose if the state could use governmental immunity to avoid constitutional restrictions.

The state and district defendants contend that the trial court erred by denying them summary disposition because plaintiffs cannot demonstrate a viable cause of action under the Michigan Constitution or MCL 380.1278(8). In contrast, plaintiffs contend that the violation and basis for liability is premised on Const 1963, art 8, §§ 1 and 2, which provide:

> Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

> Sec. 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.

There is no language within the cited constitutional provisions to support plaintiffs' claims. Article 8, § 1 merely "encourage[s]" education, but does not mandate it. Article 8, § 2 is specifically contrary to plaintiffs' position as it only requires the "legislature" to "maintain and support a system of free public elementary and secondary schools," with a local school district having the responsibility to "provide for the education of its pupils . . . ." It has been recognized that the State Board of Education falls within the executive, not the legislative, branch of our government, *Straus v Governor*, 459

Mich 526, 537; 592 NW2d 53 (1999), and it is therefore
not a part of the branch of government referred to in
Article 8, § 2. Given the language of the cited constitu-
tional provisions, the role of the state in education is
neither as direct nor as encompassing as argued by
plaintiffs. The trial court should have granted summary
disposition in favor of the state and district defendants
with respect to plaintiffs' constitutional claims.

Although not cited by plaintiffs, Const 1963, art 8, § 3
defines the duties of the State Board of Education, and
provides additional insight:

> Leadership and general supervision over all public edu-
> cation, including adult education and instructional pro-
> grams in state institutions, except as to institutions of
> higher education granting baccalaureate degrees, is vested
> in a state board of education. It shall serve as the general
> planning and coordinating body for all public education,
> including higher education, and shall advise the legislature
> as to the financial requirements in connection therewith.

Like the constitutional provisions considered previ-
ously, this language provides support for our conclusion
that plaintiffs do not have a direct cause of action
arising under the Michigan Constitution.

The courts have long recognized that, for constitu-
tional purposes, "[e]ducation, as important as it may be,
has been held not to be a fundamental interest." *Martin
Luther King Junior Elementary Sch Children v Mich
Bd of Ed*, 451 F Supp 1324, 1328 (ED Mich, 1978),
citing *San Antonio Indep Sch Dist v Rodriguez*, 411 US
1; 93 S Ct 1278; 36 L Ed 2d 16 (1973). Further, as
Justices T. G. KAVANAGH and LEVIN observed in a
concurring statement in *Governor v State Treasurer*,
390 Mich 389, 406 (1973) (*Governor II*):

> It must be apparent by now that we are of the opinion
> that the state's obligation to provide a system of public

schools is not the same as the claimed obligation to provide equality of educational opportunity. Because of definitional difficulties and differences in educational philosophy and student ability, motivation, background, etc., no system of public schools can provide equality of educational opportunity in all its diverse dimensions. All that can properly be expected of the state is that it maintain and support a system of public schools that furnishes adequate educational services to all children.

In sum, the cited provisions of the Michigan Constitution require only that the Legislature provide for and finance a system of free public schools. The Michigan Constitution leaves the actual intricacies of the delivery of specific educational services to the local school districts. We conclude that plaintiffs have not stated a claim or cause of action arising directly under the Michigan Constitution.

Plaintiffs further argue that they have stated a claim under MCL 380.1278, with particular emphasis on MCL 380.1278(8), which provides:

Excluding special education pupils, pupils having a learning disability, and pupils with extenuating circumstances as determined by school officials, a pupil who does not score satisfactorily on the 4th or 7th grade Michigan educational assessment program reading test shall be provided special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months.

The language of this statute indicates the dichotomy in responsibility between the state and local school districts in the provision of educational services. Specifically, MCL 380.1278(3) refers to the local district's responsibility to establish an actual curriculum for implementation with students. Any role of the state is merely advisory in suggesting a model curriculum subject to adoption by the local districts. MCL 380.1278(2).

Similarly, Subsection (8) leaves the determination of students identified as deficient on the MEAP reading tests for "school officials," indicating decision-making at the local, and not state, level. This is also consistent with provisions of the Revised School Code[2] and the assessment of remedial assistance programs act.[3] MCL 380.11a(3) defines the general powers of school districts:

> A general powers school district has all of the rights, powers, and duties expressly stated in this act; may exercise a power implied or incident to a power expressly stated in this act; and, except as provided by law, may exercise a power incidental or appropriate to the performance of a function related to operation of the school district in the interests of public elementary and secondary education in the school district, including, but not limited to, all of the following:
>
> (a) Educating pupils. In addition to educating pupils in grades K-12, this function may include operation of pre-school, lifelong education, adult education, community education, training, enrichment, and recreation programs for other persons.

In turn, MCL 380.1282 provides in relevant part:

> (1) The board of a school district shall establish and carry on the grades, schools, and departments it considers necessary or desirable for the maintenance and improvement of its schools and determine the courses of study to be pursued.
>
> (2) The board of a school district shall provide a core academic curriculum, learning processes, special assistance particularly for students with reading disorders or who have demonstrated marked difficulty in achieving success on standardized tests, and sufficient access to each of these so that all pupils have a fair opportunity to achieve a state endorsement under section [MCL 380.1279].

---

[2] MCL 380.1 *et seq.*

[3] MCL 388.1081 *et seq.*

Finally, the statutory provision establishing MEAP testing, MCL 388.1081, indicates the very general oversight and informational nature of the state's role in educational services, providing:

A statewide program of assessment of educational progress and remedial assistance in the basic skills of students in reading, mathematics, language arts and/or other general subject areas is established in the department of education which program shall:

(a) Establish meaningful achievement goals in the basic skills for students, and identify those students with the greatest educational need in these skills.

(b) Provide the state with the information needed to allocate state funds and professional services in a manner best calculated to equalize educational opportunities for students to achieve competence in such basic skills.

(c) Provide school systems with strong incentives to introduce educational programs to improve the education of students in such basic skills and model programs to raise the level of achievement of students.

(d) Develop a system for educational self-renewal that would continuously evaluate the programs and by this means help each school to discover and introduce program changes that are most likely to improve the quality of education.

(e) Provide the public periodically with information concerning the progress of the state system of education. Such programs shall extend current department of education efforts to conduct periodic and comprehensive assessment of educational progress.

Read together with these related statutory provisions, it is clear that MCL 380.1278(8) does not impose a duty on the state defendants to directly provide services for students who do not perform satisfactorily on the MEAP test.

We acknowledge that the applicability of this provision is different with regard to the district defendants. MCL 380.1278(8) mandates "school officials" identify pupils that fail to "score satisfactorily on the 4th or 7th grade [MEAP] reading test" and to provide these individuals with "special assistance reasonably expected to enable the pupil[s] to bring [their] reading skills to grade level within 12 months." However, there remain at least two problems with plaintiffs' argument. First, the trial court denied plaintiffs' request to certify two classes of students. Accordingly, any remedy or outcome of this litigation is restricted to the eight identified students. Second, plaintiffs' pleadings are only sufficient with regard to two of the eight students named, FC and ID, who have deficient MEAP scores in reading for the relevant grade levels. Three students, CM, LB and MS, do not necessarily fall within the purview of MCL 380.1278(8). CM was in the third grade at the time and, therefore, did not have MEAP scores for fourth and seventh grade reading proficiency. Although LB and MS had progressed further in school, there are no specific MEAP scores identified for them that are consistent with the grade levels specified in MCL 380.1278(8). Finally, although SD, DF, and LM have deficient reading scores on the MEAP for the relevant grade levels, they have already been provided additional instruction. Further, it remains to be determined whether the qualifying students are subject to exclusion from additional instruction premised on "extenuating circumstances as determined by school officials . . . ." MCL 380.1278(8). While the form of the additional instruction may be deemed insufficient given the lack of progress in developing reading proficiency for these students, this would constitute a separate and distinct claim.

With respect to the district defendants, then, the question is whether MCL 380.1278(8) authorizes, for the qualified students, a private cause of action and whether such an action would be subject to immunity. MCL 380.1278 contains no express authorization permitting a private cause of action against a local school district for failing to comply with the statutory requirements; nor is there any evidence that the Legislature intended such a remedy. See *Lash v Traverse City*, 479 Mich 180, 194; 735 NW2d 628 (2007). Given the absence of any express legislative authorization, the statutory provision does not provide a private cause of action for monetary damages. *Id.*

In addition, we note that a school district, its board members, and its employees are generally protected by governmental immunity. See MCL 691.1407(1) and (2); MCL 691.1401(b) and (d); *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 400 n 8; 792 NW2d 686 (2010) (CORRIGAN, J., dissenting). Immunity, however, would not be available under the circumstances. As explained by Justice CORRIGAN:

> The inquiry is different when, as here, a governmental agency is involved. Because governmental agencies are generally immune from suit under the governmental tort liability act, MCL 691.1407, a plaintiff may sue a governmental agency for damages only when the Legislature *expressly* so authorizes. These cases do not establish that a plaintiff may infer a private cause of action for damages against a governmental agency. Rather, in a suit against a governmental agency, a plaintiff generally may seek only injunctive or declaratory relief upon showing that the particular plaintiff has a clear, legally enforceable right that the particular defendant had a duty to protect. [*Lansing Sch Ed Ass'n*, 487 Mich. at 399-400 (CORRIGAN, J., dissenting), citing *Lash*, 479 Mich at 194, 196 (citation omitted).]

Plaintiffs in this matter contend that they are not seeking economic damages, but rather a writ of mandamus to enforce the statutory provision, precluding the district defendants' claim of immunity. They assert that although the additional services required under MCL 380.1278(8) may require an ancillary expenditure of funds, the relief sought is primarily equitable and nonmonetary in nature.

A trial court's grant or denial of a writ of mandamus is reviewed for an abuse of discretion. *Casco Twp v Secretary of State*, 472 Mich 566, 571; 701 NW2d 102 (2005). "A court by definition abuses its discretion when it makes an error of law." *In re Waters Drain Drainage Dist*, 296 Mich App 214, 220; 818 NW2d 478 (2012). Although the underlying question whether the writ should be issued is reviewed for an abuse of discretion, "this Court reviews de novo as questions of law whether a defendant has a clear legal duty to perform and whether a plaintiff has a clear legal right to performance." *Barrow v Detroit Election Comm*, 301 Mich App 404, 411; 836 NW2d 498 (2013).

" '[A] writ of mandamus is an extraordinary remedy and will only be issued where (1) the party seeking the writ has a clear legal right to performance of the specific duty sought, (2) the defendant has the clear legal duty to perform the act requested, (3) the act is ministerial, and (4) no other remedy exists that might achieve the same result.' " *Sal-Mar Royal Village, LLC v Macomb Co Treasurer*, 301 Mich App 234, 237; 836 NW2d 236 (2013), quoting *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 284; 761 NW2d 210 (2008) (alteration in original).

In *Hanlin v Saugatuck Twp*, 299 Mich App 233, 248; 829 NW2d 335 (2013), this Court explained:

> A ministerial act is one for which the law prescribes and
> defines the duty to be performed with such precision and
> certainty as to leave nothing to the exercise of judgment or
> discretion. If the act requested by the plaintiff involves
> judgment or an exercise of discretion, a writ of mandamus
> is inappropriate. [Citation omitted.]

With regard to plaintiffs' request for a writ of mandamus, MCL 380.1278(8) indicates that plaintiffs had a legal right to receive "special assistance" in specifically defined or restricted circumstances. In turn, the district defendants had a statutory duty under MCL 380.1278(8) to provide "special assistance" to otherwise-qualified students who did "not score satisfactorily on the 4th or 7th grade [MEAP] reading test . . . ."

What precludes issuance of such a writ, however, is that the act to be performed cannot be considered ministerial in nature, as the school district is afforded wide-ranging discretion. Initially, the school district is permitted to identify the qualifying students, but the statute fails to define which pupils may have "extenuating circumstances" and thus may not be encompassed within the statute. In addition, the service to be provided is comprised of "special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months." While a defined goal is therefore provided, the actual method to be used is undefined and quite subjective, with the selected programs and instruction varying considerably based on the individual needs of the pupils and their respective academic grade and proficiency levels. Consequently, by definition, a writ of mandamus is not an appropriate remedy in this case. See *Hanlin*, 299 Mich App at 248.

The district defendants further assert that the trial court erred by failing to dismiss plaintiffs' claims be-

cause the claims were nonjusticiable and, in the alternative, the claims were rendered moot by the appointment of an emergency manager.

Given the lack of a remedy specified by the statute at issue, MCL 380.1278(8), we conclude that enforcement of this provision is not a matter for the courts, but rather an administrative matter better resolved between individuals seeking to obtain or enforce services and the pertinent school district. Moreover, it would be difficult, if not impossible, for the courts to fashion innumerable individual remedies. Indeed, determinations regarding the type of services that are necessary for individual pupils to meet the statutory reading-skills requirements fall within the expertise of the schools—not the courts. As observed in a slightly different context, " '[g]iven the nature of the case,' " it is incumbent on the courts to " 'take note of the limits of judicial competence in such matters.' " *Straus*, 459 Mich at 531 (citation omitted). Courts " 'cannot serve as . . . overseers . . . weighing the costs and benefits of competing . . . ideas or the wisdom of . . . taking certain actions, but may only determine whether some . . . provision has been violated . . . .' " *Id.* (citation omitted). While there is little genuine controversy that the district defendants have abysmally failed their pupils, the mechanism to correct this failure is not through the court system, particularly given the remedy sought by plaintiffs. The problem is multifaceted, comprised of deficiencies in the manner and type of academic instruction received, but also impacted by a variety of social and economic forces unique to the circumstances of each student. Consequently, there is no one-size-fits-all solution, and the greatest impact for each student will be one that is made up of several components and addresses his or her individual needs. Such a solution is not available through judicial intervention. We conclude

that the specific dispute at issue in this case, calling for
the implementation of individualized reading programs
and complex educational services, perhaps over a long
period of time, is nonjusticiable in nature as it would
necessitate undue intrusion upon the other branches of
government and would require us to move beyond our
area of judicial expertise. See *House Speaker v Governor*, 443 Mich 560, 574; 506 NW2d 190 (1993).

Given our conclusion that the trial court improperly
denied summary disposition for the state and district
defendants, we need not decide whether the issues in
this case have been rendered moot by the appointment
of an emergency manager and the subsequent contracting for charter schools. For the same reason, we decline
to consider the district defendants' claims regarding the
issuance of an amended scheduling order.[4]

Reversed and remanded for entry of judgment in
favor of the state and district defendants. We do not
retain jurisdiction. No taxable costs pursuant to MCR
7.219, a public question having been involved.

MURRAY, P.J., concurred with JANSEN, J.

MURRAY, P.J. (*concurring*). In their briefs filed with
this Court plaintiffs have set forth evidence that they
are not educated to the level that would be reasonably

---

[4] It is true, as our dissenting colleague observes, that plaintiffs also
requested declaratory relief. Plaintiffs' request for declaratory relief was
not set forth as a separately labeled cause of action in their complaint.
But this was not fatal to their request. "Although it has become
commonplace in this state for a plaintiff to assert a request for declaratory relief as a separately labeled cause of action within his or her
complaint, this is technically improper because 'declaratory relief is a
remedy, not a claim.'" *Wiggins v City of Burton*, 291 Mich App 532, 561;
805 NW2d 517 (2011) (citation omitted). Nevertheless, given our foregoing analysis, we conclude that plaintiffs were not entitled to declaratory
relief in this matter.

expected given their ages. This evidence should be of
great concern to their parents, school authorities, and
frankly any taxpayer or other concerned citizen. But
those important educational concerns are not what we,
judges of a court of law, are addressing today, for our
exclusive task is to determine whether plaintiffs can
pursue the legal theories set forth in their complaint.
The majority opinion adequately explains why they
cannot, and therefore I join that opinion. I write sepa-
rately to briefly address some of the more specific
arguments put forth by plaintiffs.

First, as made clear during oral argument before this
Court, plaintiffs' constitutional arguments are not an-
chored in the text of either Const 1963, art 8 § 1 or § 2,
yet it is that text that we must apply in determining
whether plaintiffs can maintain a claim under these
state constitutional provisions.[1] It is plain that nothing
in either § 1 or § 2 of Article 8 even touches upon the
specific issues about which plaintiffs complain. Instead,
as the majority opinion makes clear, those provisions
only articulate general aspirational propositions that
are to guide the Legislature's enactment of legislation
containing more specific education policy choices.[2] In no
way can they be legitimately read to support a *consti-*

---

[1] To prevail against the state, plaintiffs would also have to show that
any injury they suffered was caused by a state custom or policy, *Jones v
Powell*, 462 Mich 329, 336; 612 NW2d 423 (2000), but that issue need not
be addressed because there is no basis in the text for these claims.

[2] Indeed, Article 8, § 2 states that the Legislature shall maintain and
support free public schools "as defined by law," which means that the
public school system called for in § 2 is to be implemented by the
Legislature. See *Midland Cogeneration Venture Ltd Partnership v Naf-
taly*, 489 Mich 83, 93-94; 803 NW2d 674 (2011); *People v Perks (On
Remand)*, 259 Mich App 100, 113; 672 NW2d 902 (2003). This implies
that a judicial monetary remedy for a violation of the general standards
of § 2 would be inappropriate to recognize. *Lewis v Michigan*, 464 Mich
781, 787; 629 NW2d 868 (2001).

*tutional* right to specific educational results or to a guarantee of a certain level of education.

Second, plaintiffs maintain that their argument *is* supported by the text, as least in so far as the Michigan Supreme Court has construed § 2. In that regard, plaintiffs argue that in *Bond v Ann Arbor Sch Dist*, 383 Mich 693; 178 NW2d 484 (1970), our Supreme Court recognized a cause of action under Article 8, § 2. It is certainly true that the *Bond* Court upheld the plaintiffs' challenge under Article 8, § 2, that the school district was required to pay for books their children would use in public school. See *Bond*, 383 Mich at 699-702. But, in our decision today, we are assuming a direct cause of action can be brought under this provision. The question is whether plaintiffs' allegations make out a potential violation of these constitutional provisions, and in that regard *Bond* is of no assistance. *Bond* addressed a challenge invoking precise language in the constitutional provision—what was meant by a "free" public education—while plaintiffs in this case can point to no language in the text that supports their challenge seeking to establish a specific level or quality of education through the provision of a free public education. Thus, *Bond*'s analysis does not help here.[3]

Third, as the majority opinion makes clear, the statutory provision raised by plaintiffs, MCL 380.1278(8), is not amenable to mandamus relief. To implement that provision, which is itself a legislative remedy for poor reading performances as it compels

---

[3] The dissent asserts that *Bond* applies to plaintiffs' allegation that " '[t]here is a critical lack of textbooks in most classrooms.' " (Citation omitted.) *Bond*, however, only addressed whether under Article 8, § 2 a school district could require parents to pay for required textbooks, not the unrelated and policy driven question as to how many textbooks are sufficient for a particular class. And, plaintiffs do not allege that the school district is charging them for any of the textbooks.

school districts to provide "special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months," requires an enormous amount of discretion on the part of educators. On this point, it bears emphasizing what both the United States Supreme Court and our state Supreme Court have repeatedly held: judges are not equipped to decide matters of educational policy. See, e.g., *Parents Involved In Community Schs v Seattle Sch Dist No 1*, 551 US 701, 849; 127 S Ct 2738; 169 L Ed2d 508 (2007) (Breyer, J., dissenting), citing, *inter alia*, *San Antonio Indep Sch Dist v Rodriguez*, 411 US 1, 49-50; 93 S Ct 1278; 36 L Ed 2d 16 (1973); see also *Wisconsin v Yoder*, 406 US 205, 234-235; 92 S Ct 1526; 32 L Ed 2d 15 (1972); *Page v Klein Tools, Inc*, 461 Mich 703, 714-716; 610 NW2d 900 (2000); *Larson v Burmaster*, 2006 Wis App 142, ¶ 42; 295 Wis 2d 333; 720 NW2d 134 (2006).

This holds true whether we are addressing mandamus relief or trying to define what specific level of education is required by the Constitution. Indeed, in Michigan—like most states—what type of programs should be utilized to implement the general guarantees of Article 8, §§ 1 and 2, is a decision primarily left to either the state legislature or locally elected school district boards of education. *Slocum v Holton Bd of Ed*, 171 Mich App 92, 95-96; 429 NW2d 607 (1988); *Sheridan Rd Baptist Church v Dep't of Ed*, 132 Mich App 1, 21; 348 NW2d 263 (1984), aff'd 426 Mich 462 (1986). Those elected bodies have the capacity to conduct a number of tasks to address these important issues, including the ability to hear different policy arguments, listen to arguments for and against specific educational programs, to allow the taking of testimony, and to receive input from teachers and constituents, to name just a few. See, e.g., *Henry v Dow Chem Co*, 473 Mich 63,

92 n 24; 701 NW2d 684 (2005). We, the judiciary, do not have that same capacity, ability, or role, as we serve a significantly different and limited function in state government. *Id.*

Fourth, and finally, plaintiffs offer a number of decisions from our sister states holding that their state constitutions provide a guaranteed minimal level of education. It is certainly true that some state appellate courts have come to that conclusion. But it is just as true that, as most of those courts recognize, these decisions are "necessarily controlled in large measure by the particular wording of the constitutional provisions of those state charters regarding education . . . ." *Tennessee Small Sch Sys v McWherter,* 851 SW2d 139, 148 (Tenn, 1993). As the Iowa Supreme Court highlighted, many state constitutions' education clauses contain words like "adequate," "efficient," "quality" or "thorough" that denote a level of quality to the education that must be provided, *King v Iowa,* 818 NW2d 1, 19-21 (Iowa, 2012) (quotation marks and citations omitted), but, as discussed, our provisions contain no such verbiage. Many of the other cases relied upon by plaintiffs address funding level issues, and that issue—as plaintiffs have argued—is not a part of this lawsuit.[4] And if that issue was raised, plaintiffs would have a tough hurdle to overcome. See *Governor v State Treasurer,* 390 Mich 389 (1973) (T. G. KAVANAGH and LEVIN, JJ., concurring) (*Governor II*), and *East Jackson Pub Sch v Michigan,* 133 Mich App 132, 136-138; 348 NW2d 303 (1984).

---

[4] The following cases are therefore not analogous to the present controversy, at least in so far as they deal with the adequacy of legislative funding: *Leandro v North Carolina,* 346 NC 336, 342-343; 488 SE2d 249 (1997), *Tennessee Small Sch Sys,* 851 SW2d at 148-149, *Abbott v Burke,* 119 NJ 287, 314-315; 575 A2d 359 (1990), and *Rose v Council for Better Ed, Inc,* 790 SW2d 186 (Ky, 1989).

To the extent some courts have concluded that general, "aspirational" language similar to our language does call for minimum levels of educational results, I simply disagree with those decisions. I cannot by judicial fiat read words like "sufficient," "adequate" or "quality" into the text of Article 8, § 2, no matter how sound the result of doing so might seem,[5] when those words were not ratified by the people themselves. See *Nat'l Pride At Work, Inc v Governor*, 481 Mich 56, 67-68; 748 NW2d 524 (2008). That is not the proper function of the judiciary. We are neither equipped with the power nor the expertise to determine what courses, teaching credentials, staffing levels, etc., are necessary to provide whatever would be determined to be an adequate education. In the end, the constitutionally appropriate forum for plaintiffs is the ballot box, not the courts. "Voters elect our governor, legislators, and school board members. If these plaintiffs do not like how [Highland Park] schools are run, they should turn to the ballot box, not the courts." *King*, 818 NW2d at 43 (Waterman, J., concurring).[6] See, also, *Smith v Henderson*, 54 F Supp 3d 58, 61 (D DC, 2014) ("The core problem here is that the parents' fight is one for the ballot box—not the courts.").

The dissent's vituperative opinion glosses over many of the important legal distinctions that control the outcome of this case as framed by plaintiffs. Though all

---

[5] After all, no sane individual would oppose the proposition that Michigan schools should provide a quality education for all, particularly when so many financial resources are already provided to K-12 public education.

[6] At least one elected official, Governor Snyder, has acted pursuant to legislation (MCL 141.1541 *et seq.*) by appointing an emergency manager to oversee certain of the school district's operations in an attempt to remedy many of the problems that have plagued the district.

of us agree that the evidence of prior performance in the school district amongst this segment of students was poor, as members of the judiciary we cannot let our moral, political or emotional views of that situation obscure the rule of law that we must apply. See *Planned Parenthood of Greater Iowa, Inc v Miller*, 30 F Supp 2d 1157, 1160 (SD Iowa, 1998), aff'd 195 F3d 386 (CA 8, 1999). That said, several points must be made in response to the dissenting opinion.

First, the majority opinion is not leaving plaintiffs without a remedy. A remedy exists, it is simply not to be found, under these constitutional provisions and statute, in the court system. Instead, as previously made clear, the Michigan Constitution itself indicates that it is the Legislature that is to define the scope of the public education that Michigan children are entitled to, as the key phrase within Article 8, § 2, "as defined by law," indicates. See note 2 of this opinion and *King v Oakland Co Prosecutor*, 303 Mich App 222, 241; 842 NW2d 403 (2013). That delegation, coupled with the generalized language of the provision itself, compels the conclusion that *what level* of education is mandated by the Constitution is for the legislative branch to decide.

Second, and relatedly, the dissent offers a definition of "education" that we should utilize to define that term in Article 8, § 2. Assuming that definition was the common meaning at the time the Constitution was ratified in 1963, *Nat'l Pride At Work*, 481 Mich at 67, the definition offered by the dissent does not itself speak to a particular level of education required. Rather, it merely defines the ultimate goal of education, i.e., "developing" the knowledge, skills, minds and character of our youth. It provides no gauge as to the level of education to be provided and, as a result, how

courts are to enforce such vague provisions.[7] And this again highlights the significant obstacle that plaintiffs face in this case: the remedy. To judicially impose a remedy will either immediately, or inevitably, lead the courts into the forbidden territory of educational policymaking.

For example, say a school district's seventh graders average 55% on a math assessment test, and a court concluded that the district (not the state) was not sufficiently "developing" the students' minds, at least as it pertained to math. The dissent opines that an order simply declaring that the minimum level was not attained would suffice, and the school district—perhaps with assistance from the state—could develop ways to improve. But to what level? A 60%, 70% or 80% average? What about a 100% passing average? What curriculum should be used to obtain these higher averages? Should there be a lower teacher to student ratio for those students who have performed below the average? And, if the first attempt is unsuccessful in reaching that subjective goal, when will the court—through use of experts—start deciding what method would be *more appropriate* for the district to implement next in the name of complying with its order? Court supervision of the district's teaching methods and curriculum would be inevitable, yet that is precisely what the supreme

---

[7] Moreover, the dissent's reliance upon the "adequate educational services" phrase from *Governor II*, 390 Mich at 406, is greatly misplaced. *Governor II* was simply an order declaring that the Court's prior opinions addressing the governor's request for answers to certified questions, *Governor v State Treasurer*, 389 Mich 1; 203 NW2d 457 (1972) (*Governor I*), were vacated because the request had been improvidently granted, *Governor II*, 390 Mich 389. The concurring statement issued with the order that contains the phrase cited by the dissent, was signed by only two justices who agreed with the dismissal of the cause and the vacating of the prior opinions. Therefore, the statement was plainly dictum that commanded no majority.

courts of this state and nation have warned against. See *Yoder*, 406 US at 234-235; *Page*, 461 Mich at 714-716. The Illinois Supreme Court properly articulated these same constitutional concerns in *Lewis E v Spagnolo*, 186 Ill 2d 198, 209; 238 Ill Dec 1; 710 NE2d 798 (1999):

> Attempting to distinguish "high quality" from "minimally adequate" in this context is nothing more than semantics. No matter how the question is framed, recognition of the plaintiffs' cause of action under the education article would require the judiciary to ascertain from the constitution alone the content of an "adequate" education. The courts would be called upon to define what minimal standards of education are required by the constitution, under what conditions a classroom, school, or district falls below these minimums so as to constitute a "virtual absence of education," and what remedy should be imposed. Our decision in *Committee for Educational Rights* [*v Edgar*, 174 Ill 2d 1; 220 Ill Dec 166; 672 NE2d 1178 (1996)] made clear that these determinations are for the legislature, not the courts, to decide.

See, also, *Nebraska Coalition for Ed Equity & Adequacy v Heineman*, 273 Neb 531, 553-554; 731 NW2d 164 (2007).

In sum, whether it is a good or bad policy choice, the ratifying voters in 1963 gave the Legislature full authority to define the public education to be provided by school districts. The Legislature responded with, amongst other things, the very detailed Revised School Code. See MCL 380.1 *et seq*. Many of the statutes in that code contain remedies to be employed by districts once certain low scores occur, as is the case with MCL 380.1278(8). But mandamus is not an appropriate way to enforce that provision because of the built-in discretion required to implement that statute and because a decision by the school district as to those qualifying

plaintiffs has been made and implemented; plaintiffs are challenging the decision made and asserting that there are better programs for the school district to utilize in implementing the "special assistance" required under the statute[8]. As a consequence, the children—through their parents—have a remedy; it is just not with the courts under the claims pleaded by plaintiffs.

SHAPIRO, J. (*dissenting*). In one of the most significant cases of the last century, the United States Supreme Court declared that "education is perhaps the most important function of state and local governments." *Brown v Topeka Bd of Ed*, 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954). Nine years after that decision, the people of this state approved a new Constitution providing that local school districts "shall" provide an education to all students and that the Legislature "shall" maintain and support such schools. Const 1963, art 8, §§ 1 and 2. Sadly, my colleagues in the majority have judicially repealed these provisions with their decision today. They have also, by judicial fiat, repealed a legislative enactment that requires school districts to take specific action when pupils fail to attain basic competencies. MCL 380.1278(8).

I reject the majority's miserly view of the education constitutionally due Michigan's children. I agree with the majority that the judiciary is not suited to, and should avoid attempting to, manage school administration or fine-tune educational policy. However, this does not excuse the majority's abandonment of our essential judicial roles: enforcing the rule of law even when the

---

[8] Hence, this case is a far cry from what was at issue in *Teasal v Dep't of Mental Health*, 419 Mich 390, 409-412; 355 NW2d 75 (1984), where no decision had been made by the defendant under established criteria.

defendants are governmental entities and protecting the rights of all those who live within Michigan's borders, particularly those, like children, who do not have a voice in the political process. While the judiciary is not suited to selecting and executing educational policy, it is suited to determining whether defendants are complying with their constitutional and statutory duties and ordering them to take timely action to do so.

I. PLAINTIFFS' ALLEGATIONS AND THE MAJORITY'S CONCLUSIONS

Plaintiffs, students of defendant Highland Park School District (HPSD), allege that the government defendants violated plaintiffs' constitutional rights under Const 1963, art 8, §§ 1 and 2, and violated their own statutory duties under MCL 380.1278(8). Defendants assert that plaintiffs' complaint does not state a cause of action. That complaint, as noted by the trial court when it denied defendants' motion for summary disposition, contains a lengthy list of factual assertions that can only be fairly described as shocking and which, for purposes of this motion, we must adopt as true.[1] The majority concludes that even if these allegations and other equally disturbing ones are true, no court may even consider whether the education being provided to the children of Highland Park fails to meet constitutional and statutory requirements.

A few of the more disturbing accusations are as follows:

---

[1] *Waltz v Wyse*, 469 Mich 642, 647-648; 677 NW2d 813 (2004) (citation omitted) ("In determining whether summary disposition was properly granted under MCR 2.116(C)(7), this Court consider[s] all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict them.") (citation and quotation marks omitted) (alteration in original). In addition, defendants do not, at least for purposes of this motion, dispute the accuracy of plaintiffs' factual allegations.

• There are 973 students enrolled in the HPSD;

• 65% of fourth-grade students tested below "proficient" on the Michigan Educational Assessment Program (MEAP) reading test and 87% scored below "proficient" on the MEAP math test;[2]

• 75% of seventh-grade students scored below "proficient" on the MEAP reading test and 93% scored below "proficient" on the MEAP math test;

• At the high school level, 90% of students failed the Michigan Merit Examination[3] reading test, 97% failed the math test, 94% failed the writing test, 100% failed the social studies test, and 100% failed the science test;

• A lack of textbooks exists such that students are rarely able to take home textbooks;

• Many classrooms have inadequate heat or no heat at all;

• School buildings are unsecured such that a homeless man was able to live and sleep in the facilities without detection by school officials; and

• Student files do not contain assessments of grade level performance, current and post MEAP assessment, counseling records, attendance records, or discipline records.

By contrast, in the demographically similar school district of Inkster, 98% of students met reading and math standards on the 2010 MEAP.

Failing to refer to these, or any of the other equally disturbing allegations in plaintiffs' complaint, the majority reaches the following conclusions: (1) the provision in

---

[2] Student performance on the MEAP is calculated to fall in one of four categories: "advanced," "proficient," "partially proficient," and "not proficient."

[3] This is the final standardized test administered to Michigan students.

the Michigan Constitution that guarantees that every school district "shall provide for the education of its pupils," Const 1963, art 8, § 2, has neither meaning nor effect and no level of failure by a school district to provide these requirements can ever constitute a violation of this provision; (2) the language in Article 8, §§ 1 and 2 of the Michigan Constitution providing that the state shall "maintain and support" a system of public schools and that "the means of education shall forever be encouraged," are merely aspirational and have no force of law; (3) that no child, parent, or citizen has the authority to seek judicial enforcement of the statutory mandate contained within MCL 380.1278(8) that a student whose reading ability is below grade level "shall be provided special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months." All these conclusions are erroneous.

## II. CONSTITUTIONAL CLAIMS

Plaintiffs' constitutional claims arise solely under the education provisions of the 1963 Michigan Constitution. Specifically, plaintiffs' complaint alleges that defendants have violated Const 1963, art 8, §§ 1 and 2, which provide:

> Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and *the means of education shall forever be encouraged.*

> Sec. 2. The legislature *shall maintain and support a system of free public elementary and secondary schools* as defined by law. *Every school district shall provide for the education of its pupils* without discrimination as to religion, creed, race, color or national origin. [Emphasis added.]

By virtue of their employment of the word "shall," these constitutional provisions are mandatory and re-

quire compliance. See *Port Huron v Amoco Oil Co, Inc*, 229 Mich App 616, 631; 583 NW2d 215 (1998) (stating that it is a well-established rule of statutory interpretation that "[w]hile the word 'shall' is generally used to designate a mandatory provision, 'may' designates discretion"). Nonetheless, the majority dispenses with these constitutional provisions in conclusory fashion with little, if any, analysis or consideration of the law. Its analysis falters at the very first step by relying on the fact that education is not a "fundamental interest" under the equal protection clause. See *Martin Luther King Jr Elementary Sch Children v Mich Bd of Ed*, 451 F Supp 1324, 1328 (ED Mich, 1978) (*MLK*).[4] While plaintiffs did assert an equal protection claim under Const 1963, art 1, § 2 before the trial court, that claim is not before this Court in the instant appeal, rendering the majority's discussion of equal protection a red herring.[5] The sole issue is whether plaintiffs have stated a claim that our Constitution's educational provisions have been violated.

The balance of the majority's consideration of § 1 is limited to a single conclusory sentence reading: "Article 8, § 1 merely 'encourage[s]' education, but does not

---

[4] In this regard, defendants and the majority rely heavily on *MLK*, 451 F Supp 1324, a single federal trial court opinion from 1978. The bulk of *MLK* involved the application of the federal Equal Protection Clause, a claim not raised in this case. *Id.* at 1327-1334. *MLK* did briefly address a claim made under Const 1963, art 8, § 2, concluding that it did not guarantee "equal" education to all students. *Id.* at 1333-1334. But *MLK* certainly did not define the scope of Const 1963, art 8, § 2, and, of course, we are not bound by lower federal court opinions. *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004).

[5] Moreover, even if plaintiffs' equal protection claim was before this Court, the fact that education has been held not to be a fundamental interest does not, in itself, defeat that claim. See, e.g., *Frame v Nehls*, 452 Mich 171, 183; 550 NW2d 739 (1996) ("Unless the [alleged] discrimination impinges on the exercise of a fundamental right or involves a suspect class, the inquiry under the Equal Protection Clause is whether the classification is rationally related to a legitimate governmental purpose.").

mandate it."[6] The majority opinion wholly fails to address the considerable body of law in this state and sister states addressing the scope and import of such a constitutional provision.

As for § 2, the majority ignores the use of the mandatory word "shall" in the provision's first and second sentences, applying to the Legislature and the relevant school district respectively.[7] In so doing, the majority revises the Constitution's language so as to conclude that § 2 can never be violated. In the majority's view, there are no minimal requirements to "maintain and support." Moreover, a school district could provide nothing more than a building for students to sit in but remain in compliance with this constitutional provision, because, in the words of the majority, the Constitution leaves to the district "the actual intricacies of the delivery of specific educational services . . . ." I might agree with that sentiment if the issue in this case was merely the "intricacies" of the delivery of educational services. However, that is not the situation before us. Indeed, I do not believe that any reasonable person, and certainly no reasonable parent, would conclude that intricacies are at issue when, at the HPSD's high school, 90% of students failed the Michigan Merit Examination reading test, 97% failed the math test, 100% failed the social studies test, and 100% failed the science test. The message the majority sends

---

[6] Alteration in original.

[7] In *Feaster v Portage Pub Schs*, 451 Mich 351; 547 NW2d 328 (1996), the Supreme Court unanimously reversed the dismissal of a complaint seeking declaratory and injunctive relief against a school district. The Court emphasized that the statutory use of the word "shall" in directing action by a school district defeated the district's claims. It noted the longstanding policy that school laws are "to be liberally construed consistent with the public policy of fostering and encouraging free public education . . . ." *Id.* at 357 (citation and quotation marks omitted).

is that the mandatory constitutional provision that a school district "shall" provide education is met simply by the existence of the school district, regardless of whether a single student receives any semblance of an actual education.

Contrary to the majority in this case, Michigan courts have been willing to address such questions in the past. In *Bond v Ann Arbor Sch Dist*, 383 Mich 693; 178 NW2d 484 (1970), the plaintiffs attended free public schools, i.e., no tuition was charged. The plaintiffs nevertheless argued that the modest fee charged by the defendant school district for books and supplies, along with various other fees imposed by the district, violated the constitutional requirement that the Legislature "maintain and support a system of free public elementary and secondary schools . . . ." Const 1963, art 8, § 2. The case was tried without a jury, and the circuit court ruled, in part, that the fees charged for books and supplies were constitutional. The Court of Appeals affirmed. *Bond v Ann Arbor Pub Sch Dist*, 18 Mich App 506; 171 NW2d 557 (1969).

Our Supreme Court unanimously reversed that portion of the lower courts' rulings. *Bond*, 383 Mich 693. It held that a system of free public schools requires the free provision of the "necessary elements of any school's activity," alternatively stated as the materials that "are an essential part of a system of free public elementary and secondary schools." *Id.* at 702 (quotation marks omitted). Most important for purposes of the instant appeal is the Court's statement that " '[n]o education of any value is possible without school books.' " *Id.* at 701-702, quoting *Crowley v Bressler*, 41 NYS2d 441, 445-446; 181 Misc 59 (1943). The *Bond* Court's analysis makes clear that when public educational services fall below some minimal level, Const 1963, art 8, § 2 has

been violated. When the education provided, like one without textbooks, is not "of any value," the state has not met its constitutional obligation.[8] *Bond*, 383 Mich at 701-702 (citation and quotation marks omitted).

In *Snyder v Charlotte Pub Sch Dist*, 421 Mich 517, 525; 365 NW2d 151 (1984), our Supreme Court stated in more general terms:

> Although public education is not a fundamental right granted by the federal constitution, *it is not merely some governmental benefit which is indistinguishable from other forms of social welfare legislation. Plyer v Doe*, 457 US 202, 221; 102 S Ct 2382; 72 L Ed 2d 786 (1982). See also *San Antonio Independent School Dist v Rodriguez*, 411 US 1, 30; 93 S Ct 1278; 36 L Ed 2d 16 (1973). "[*E*]*ducation is perhaps the most important function of state and local governments.*" *Brown v Topeka Bd of Ed*, 347 US 483, 493; 74 S Ct 686; 98 L Ed 873 (1954). [Emphasis added; alteration in original.]

The majority quotes the concurrence in *Governor v State Treasurer*, 390 Mich 389, 406 (1973) (*Governor II*) (T. G. KAVANAGH and LEVIN, JJ., concurring), for the proposition that "no system of public schools can provide equality of educational opportunity in all its diverse dimensions," but gives no weight to the sentence immediately following, which provides: "*All that can properly be expected of the state is that it maintain and support a system of public schools that furnishes adequate educational services to all children.*" (Emphasis added.) While there is no constitutional requirement that schools provide an optimal education nor that all educational services be provided with perfect equality, for the educational provisions of our Constitution to

---

[8] Even if *Bond* were read to apply to nothing outside the provision of textbooks, it would still be applicable to this case because plaintiffs' complaint alleges that "[t]here is a critical lack of textbooks in most classrooms."

have any meaning, schools must provide "adequate educational services to all children." *Id.*

Moreover, in *Governor II*, which concerned a challenge to Michigan's entire system of public school funding, *id.* at 391, the concurrence stated:

> We are presented with generalized arguments concerning the nature of educational opportunity in this state. So that our opinion not be misconstrued, it is important to note that we are not presented with a concrete claim by either individual students or by school districts that they are suffering from particular specified educational inadequacies because of deficiencies . . . . Such concrete claims, when and if raised, will stand or fall on their own merits and not on account of anything we say here. In short, *we are not abandoning the school children of this state to legislative whim in derogation of any judicially enforceable right to an education they may have under our Constitution.* [*Id.* at 392-393 (emphasis added).]

In this case, the plaintiff schoolchildren have asked the courts to make good on this commitment not to abandon them. Unlike *Governor II*, this case is not one based on "generalized arguments" about educational opportunity, but rather on objective tests that support the allegation that the overwhelming majority of students in the HPSD are not receiving a minimally adequate education. Ironically, in *Governor II*, the defendants argued that the proper way to demonstrate denial of a constitutionally required education would be to evaluate the districts "in terms of 'output,' as measured by pupil accomplishment on certain achievement tests." *Id.* at 398. This is precisely what the instant plaintiffs have done, and the testing administered by state law is their best evidence.

Plaintiffs also cite several cases from our sister states that have considered this question and provide helpful

analyses.[9] A review of these cases demonstrates that my colleagues stand nearly alone in their conclusions.

The South Carolina Supreme Court, in *Abbeville Co Sch Dist v South Carolina*, 335 SC 58, 63-64; 515 SE2d 535 (1999), considered whether the state's public school funding scheme violated either the Equal Protection Clause or the state constitution's education clause. It found no equal protection violation, *id*. at 65, but concluded that the funding scheme violated the state constitution, *id*. at 68. The relevant clause closely resembles Const 1963, art 8, § 2 and provides:

> The General Assembly shall provide for the mainte-
> nance and support of a system of free public schools open to
> all children in the state and shall establish, organize and
> support such other public institutions of learning as may
> be desirable. [*Abbeville Co*, 335 SC at 66 (quotation marks
> and citation omitted).]

The trial court in *Abbeville* had concluded that the language of the provision was nonspecific and that "judicial restraint, separation of powers, and/or the political question doctrine prevented it from considering this education clause claim." *Id*. at 67. The South Carolina Supreme Court reversed that holding, ruling that the constitutional mandate required the state to "provide the opportunity for each child to receive a minimally adequate education," which it defined as follows:

> 1) the ability to read, write, and speak the English
> language, and knowledge of mathematics and physical
> science;

---

[9] The concurrence rejects some of these cases as "not analogous" because they deal with school funding issues rather than minimal educational quality. I do not see why the distinction renders those cases irrelevant to our instant inquiry. If anything, courts should be more hesitant to review broad funding mechanisms than a particular failure to provide minimal educational services in a single school district.

2) a fundamental knowledge of economic, social, and political systems, and of history and governmental processes; and

3) academic and vocational skills. [*Id.* at 68.]

The court went on to state:

We recognize that we are not experts in education, and we do not intend to dictate the programs utilized in our public schools. Instead, we have defined, within deliberately broad parameters, the outlines of the constitution's requirement of minimally adequate education.

Finally, we emphasize that the constitutional duty to ensure the provision of minimally adequate education to each student in South Carolina rests on the legislative branch of government. We do not intend by this opinion to suggest to any party that we will usurp the authority of that branch to determine the way in which educational opportunities are delivered to the children of our State. We do not intend the courts of this State to become super-legislatures or super-school boards. [*Id.* at 69.]

This holding is consistent with the holdings of other courts that have addressed the requirements of state constitutional provisions similar to Const 1963, art 8, § 2.

In *Lake View Sch Dist No. 25 of Phillips Co v Huckabee*, 351 Ark 31; 91 SW3d 472 (2002), the Arkansas Supreme Court held that the legislative and executive branches were in violation of the state constitution's education provision. See also Ark Const 1874, art 14, § 1. In rejecting a justiciability argument similar to that made in the instant case, the court noted that "[t]he State's argument appears to be that not only are legislative acts presumed to be constitutional, but that they are *per se* constitutional and not subject to judicial review." *Lakeview*, 351 Ark at 53 (citation omitted).

The high court of New York State, the Court of Appeals, reached the same conclusion. In *Campaign for*

*Fiscal Equity, Inc v New York*, 86 NY2d 307; 631 NYS2d 565; 655 NE2d 661 (1995), that court interpreted New York's constitutional education provision, which is nearly identical to Michigan's and mandates that "[t]he legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." *Id.* at 314 (quotation marks and citation omitted). The court held that this provision "requires the State to offer all children the opportunity of a sound basic education. Such an education should consist of the basic literacy, calculating, and verbal skills necessary to enable children to eventually function productively as civic participants . . . ." *Id.* at 316 (citation omitted).

In *Claremont Sch Dist v Governor*, 142 NH 462, 472; 703 A2d 1353 (1997), the New Hampshire Supreme Court, relying on a constitutional education clause even less specific than Michigan's,[10] held that "[o]ur society places tremendous value on education. Education provides the key to individual opportunities for social and economic advancement and forms the foundation for our democratic institutions and our place in the global economy." The court went on to enumerate several "benchmarks of a constitutionally adequate public education" and left it to the legislature to meet those benchmarks. *Id.* at 474-476.

In Tennessee, the state constitutional education clause contains language resembling Michigan's, providing:

> The state of Tennessee recognizes the inherent value of education and encourages its support. The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools. The General Assembly may establish and support such post-

---

[10] See NH Const 1784, part II, art 83.

secondary educational institutions, including public institutions of higher learning, as it determines. [Tenn Const 1870, art XI, § 12.]

Relying on dictionary definitions of the word "education," the Tennessee Supreme Court held that the clause required "that the General Assembly shall maintain and support a system of free public schools that provides, at least, the opportunity to acquire general knowledge, develop the powers of reasoning and judgment, and generally prepare students intellectually for a mature life." *Tenn Small Sch Sys v McWherter*, 851 SW2d 139, 150-151 (Tenn, 1993).

Similarly, in *Rose v Council for Better Ed, Inc*, 790 SW2d 186 (Ky, 1989), the Kentucky Supreme Court addressed a Kentucky constitutional provision requiring that "[t]he General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." Ky Const 1891, § 183. The court found the question justiciable and determined that the school system was constitutionally deficient:

[W]e [do not] intend to substitute our judicial authority for the authority and discretion of the General Assembly. We are, rather, exercising our constitutional duty in declaring that, when we consider the evidence in the record, and when we apply the constitutional requirement of Section 183 to that evidence, it is crystal clear that the General Assembly has fallen short of its duty to enact legislation to provide for an efficient system of common schools throughout the state. In a word, the present system of common schools in Kentucky is not an "efficient" one in our view of the clear mandate of Section 183. The common school system in Kentucky is constitutionally deficient. [*Rose*, 790 SW2d at 189.]

In *Pauley v Kelly*, 162 W Va 672, 705-706; 255 SE2d 859 (1979), the West Virginia Supreme Court of Appeals held that their constitution required the state to pre-

pare students for useful occupations and citizenship including the development of literacy and the "ability to add, subtract, multiply and divide numbers[.]"

In *Seattle Sch Dist No. 1 of King Co v State of Washington*, 90 Wash 2d 476; 585 P2d 71 (1978), the Washington Supreme Court interpreted that state's constitutional education clause, which provides that "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders," Wash Const 1889, art IX, § 1. The court held that, under this clause, "the State's constitutional duty goes beyond mere reading, writing and arithmetic. It also embraces broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in the market place of ideas." *Seattle Sch Dist No. 1*, 90 Wash 2d at 517. The court explained that, "[t]he constitutional right to have the State 'make ample provision for the education of all (resident) children' would be hollow indeed if the possessor of the right could not compete adequately in our open political system, in the labor market, or in the market place of ideas." *Id*. at 518.

Given these holdings from our sister states, which favor plaintiffs, it is difficult to see why the majority finds judicial overreach in addressing whether our Constitution's education provision is violated when the overwhelming majority of students in the subject district cannot read or perform mathematics at grade level.

Defendants rely heavily on *King v Iowa*, 818 NW2d 1 (Iowa, 2012). However, the Iowa constitution's education clause bears little resemblance to the Michigan Constitution's education clauses. To recall, the relevant clauses of our Constitution, Const 1963, art 8, §§ 1 and 2, provide:

Sec. 1. Religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.

Sec. 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin.

The relevant clause of the Iowa constitution, by contrast, does not even contain the word "education." It reads, in relevant part, as follows: "The General Assembly shall encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement." Iowa Const 1857, art IX, div 2, § 3. See also *King*, 818 NW2d at 12.[11]

In *King*, the Iowa high court referenced its state's unusual history of rejecting any constitutional provi-

---

[11] For this reason, *King* undercuts the concurrence's conclusion that to hear plaintiffs' claim under Const 1963, art 8, § 2, the judiciary must impermissibly "read . . . into" the Constitution words such as "sufficient," "adequate," or "quality" with regard to the education required to be provided to Michigan's children. While I agree that it is not the province of the judiciary to add words to the provisions of the Michigan Constitution, I suggest that it is my colleagues who seek to do so by adding the words "with no minimal standards of quality" to the requirement that the state and school districts provide for the "education" of Michigan's children. The word "education" means "the process of training and developing the knowledge, skill, mind, character, etc., especially by formal schooling; teaching; training," *Webster's New Twentieth Century Dictionary* (2d ed), and plaintiffs assert that a constitutionally satisfactory "education" has not been provided. In addition, Const 1963, art 8, § 2 requires that the Legislature maintain and support a system of public education "as defined by law," and plaintiffs have alleged that in the HPSD, the public education is in violation of state statute MCL 380.1278(8). Also, given that the concurrence concedes that "no sane individual would oppose the proposition that Michigan schools should provide a quality education for all," it is difficult to conclude that providing an "adequate" education was not the intent of the framers and voters in adopting these constitutional provisions.

sions to mandate free public schools. The court noted that as far back as 1859 it had "reached the conclusion that no aspect of the Iowa Constitution, including the education clause, authorized the legislature to provide for public schools," and that the state's 1857 constitutional convention had voted down a proposed amendment to provide for tuition-free schools. *King*, 818 NW2d at 14-15. Given that particular constitutional history, the *King* court concluded that if the Iowa constitution "did not assure a right to a free public education, it seems untenable to argue that [it] contained a judicially enforceable right to a free public education with certain minimum standards of quality." *Id.* at 15 (emphasis omitted).

The Michigan Constitution's education clauses read very differently than the Iowa constitution's education clauses. And the other states that have addressed this question have consistently held that a cause of action may be brought and argued, and that a court may find, that the state has failed to satisfy an education clause of the state's constitution when the state has failed to provide an adequate education to its children.[12]

### III. STATUTORY CLAIMS

The majority's rejection of plaintiffs' statutory claims against the school district defendants is even more difficult to understand. MCL 380.1278(8), part of the Revised School Code,[13] provides:

---

[12] Moreover, like in *Haridopolos v Citizens for Strong Schs, Inc*, 81 So 3d 465, 472 (Fla App, 2011), "[t]he present case is, to be sure, distinguishable from *King*, which featured an attack on internal legislative processes . . . ." Notably, *Haridopolos* also concluded that even if the imposition of a remedy was beyond the court's role, the court, at minimum, had jurisdiction to enter a declaratory judgment. *Id.* at 473.

[13] MCL 380.1 *et seq.*

> Excluding special education pupils, pupils having a learning disability, and pupils with extenuating circumstances as determined by school officials, a pupil who does not score satisfactorily on the 4th or 7th grade Michigan educational assessment program [MEAP] reading test *shall be provided* special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months. [Emphasis added.]

Like the previously discussed constitutional provisions, this statute employs the word "shall," denoting required compliance on the part of the subject school district. See *Port Huron*, 229 Mich App at 631. Defendants do not appear to dispute that a majority of the relevant fourth-grade students did not score satisfactorily on the reading test, nor do they dispute that an overwhelming majority of seventh-grade students failed to do so as well. Thus, the district essentially concedes that it has violated the plain terms of the statute.

The majority nevertheless reverses the trial court's denial of defendants' motion for summary disposition, concluding that "it remains to be determined whether the [individual plaintiffs] are subject to exclusion from additional instruction premised on 'extenuating circumstances as determined by school officials . . . .' " (Citation omitted.) The fact that this issue "remains to be determined" is grounds for affirming the trial court's denial of summary disposition, not for reversing it. Moreover, defendants have not alleged or offered any evidence that the students fall within the exception for "pupils with extenuating circumstances as determined by school officials . . . ." MCL 380.1278(8).

The majority also states, "While the form of the additional instruction may be deemed insufficient given the lack of progress in developing reading proficiency for these students, this would constitute a separate and distinct claim." It offers no basis for this statement,

likely because there is none. Essentially, the majority states that if the services provided to these students are inadequate, it constitutes a "separate and distinct claim." In fact, that is exactly the letter and spirit of the claim now before us. To direct these minor plaintiffs, who have litigated these cases for over two years and are, therefore, two years closer to "graduation," to start over with a new case, premised on defendants' failure to remedy their educational shortcomings, mocks these children.

The majority further concludes that MCL 380.1278(8) does not provide a private cause of action. In reaching this conclusion, it cites only *Lash v Traverse City*, 479 Mich 180, 194; 735 NW2d 628 (2007), but does not refer to that case's reasoning. Rather, the majority implies that *Lash* held that, in the absence of an express statutory authorization of a private cause of action, no statute can ever give rise to a private cause of action. This is simply false. In *Lash*, our Supreme Court reiterated that

> when a statute is silent concerning whether a private remedy is available for a statutory violation, a court may infer a private cause of action "if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision . . . ." [*Lash*, 479 Mich at 192, quoting *Gardner v Wood*, 429 Mich 290, 301 n 5; 414 NW2d 706 (1987), quoting 4 Restatement Torts, 2d, § 874A, p 301.]

That is, a cause of action may be created to redress a statutory violation when the purpose of the statute at issue is held to be exclusively or in part (1) to protect a class of persons that includes the one whose interest has been invaded, (2) to protect the particular interest that has been invaded, (3) to protect that interest against the kind of harm that has resulted, and (4) to

protect that interest against the particular hazard from which the harm has resulted. *Lash,* 479 Mich at 192-193.

All these requirements are plainly met in this case. MCL 380.1278(8) explicitly defines the class of persons intended to be protected as "[non-special education pupils] who do[] not score satisfactorily on the 4th or 7th grade [MEAP] . . . reading test . . . ." The particular interest is obtaining a minimum level of education that will enable these children to become functioning members of society. The kind of harm is the denial of the "special assistance reasonably expected to enable the pupil to bring his or her reading skills to grade level within 12 months." The hazard is the failure to provide that assistance.

The majority's willingness to ignore the statute is particularly odd given the majority's repeated assertion that education policy is a matter for the Legislature. In enacting MCL 380.1278(8), the Legislature set education policy. It is merely a question of whether that policy, and the statute enacting it, will be enforced by the courts. The majority wrongly declines to do so.

### IV. AVAILABLE RELIEF

In large measure, my colleagues base their dismissal of this case on the ground that if plaintiffs were to prevail at trial on either their statutory or constitutional claims, relief might not be easily fashioned and some forms of relief might constitute an overextension of judicial authority. In my view, there is no basis for this concern as to plaintiffs' statutory claim and any such concern as to the constitutional claims is both premature and exaggerated.

With regard to the statutory claim, if plaintiffs were to prevail at trial, the remedy would be straightforward.

Defendants would be ordered to provide the service that is specified in MCL 380.1278(8). Moreover, contrary to defendants' argument, a writ of mandamus would be available to so direct. The statute, using the word "shall" imposes a duty on the district to provide assistance to the relevant students. I agree that the precise nature of that assistance is left to the discretion of the district, but "the writ will lie to require a body or an officer charged with a duty to take action in the matter, notwithstanding the fact that the execution of that duty may involve some measure of discretion." *Teasel v Dep't of Mental Health*, 419 Mich 390, 410; 355 NW2d 75 (1984). As defendants have acknowledged in their briefs, "mandamus will lie to compel the exercise of discretion, but not to compel its exercise in a particular manner." *Id.*[14]

Moreover, like in *Teasel*, 419 Mich at 401, in which the relevant statute required not merely any psychiatric evaluation, but an *informed* one, the statute at issue in this case, MCL 380.1278(8), mandates a standard for the "special assistance" that must be provided, namely that the assistance must be "reasonably expected" to fulfill the statutory goal of bringing students' reading skills to grade level within 12 months. As our Supreme Court has repeatedly held, "reasonably expected" is a term of art that denotes an objective standard. See

---

[14] In *Teasel*, the plaintiff sought an injunction compelling the Department of Mental Health to return him to a state mental hospital, arguing that he was entitled to treatment and had been released without the statutorily required evaluation. *Teasel*, 419 Mich at 397-398. Writing for a unanimous Court, Justice RYAN clearly articulated the scope of mandamus in a case such as that before us. He explained that while the ultimate action chosen by a governmental agent or entity may remain discretionary and, therefore, beyond mandamus, a court does possess jurisdiction to direct that governmental agent or entity to exercise its discretion and to do so in accordance with the applicable statutory standards. *Id.* at 414-415.

*Krohn v Home-Owners Ins Co*, 490 Mich 145, 162-163; 802 NW2d 281 (2011); *Allstate Ins Co v McCarn (After Remand)*, 471 Mich 283, 290; 683 NW2d 656 (2004). Indeed, in other instances that have called for a "reasonableness" determination, the Supreme Court has found mandamus an appropriate remedy. See, e.g., *Hering v Royal Oak*, 326 Mich 232, 237; 40 NW2d 133 (1949); *Employees & Judge of Second Judicial Dist Ct v Hillsdale Co*, 423 Mich 705, 722; 378 NW2d 744 (1985).

Defendants essentially argue that they are above the law. They claim to possess the authority to violate a statutory mandate and insist that no action may be taken in the courts to enforce that mandate. This is precisely the situation that Justice RYAN cautioned against in *Teasel*:

> The [mandamus] power [of the judiciary] is not one to create a duty where none existed before or to mandate action where the decision whether to act is discretionary. Rather, the power is the constitutional power of a circuit court to direct, upon the complaint of an aggrieved party, that a duty imposed by law upon the executive department of government to make a decision according to legislatively established criteria be carried out. Were it otherwise, our citizens would be powerless to compel their public servants to conduct the business of government—to make a decision, whether good or bad, but some decision, based upon the legislatively established criteria where the duty to make a decision is clear. [*Teasel*, 419 Mich at 412 (emphasis omitted).]

In this case, plaintiffs allege that defendants have violated a statutory mandate, i.e., that they "shall" provide "special assistance" to students that fail the fourth- or seventh-grade MEAP reading test. While the precise nature of that required assistance remains discretionary, the government entity may not use that

discretion as an excuse to simply take no action at all. In other words, a government entity may not wholly avoid compliance with a statutory mandate on the ground that it retains some discretion as to the particular method of compliance.

I agree with my colleagues that defining a judicial remedy for the constitutional claim, should it be shown to be meritorious, may pose challenges. However, it is likely that a judicially crafted remedy would not be necessary. The parties may, and I believe likely would, design a remedy to which they can agree. If that does not occur, the question of remedy can be referred to the legislative branch for first consideration. Many state courts that have ruled in favor of plaintiffs on claims like the one now before us have declared the status quo unconstitutional and, rather than attempting to define what must be done, have simply directed the legislative or executive branch to adopt remedial action of their own choice and design. See *Claremont Sch Dist v Governor*, 143 NH 154, 157-158; 725 A2d 648 (1998); *Sheff v O'Neill*, 238 Conn 1, 3-4; 678 A2d 1267 (1996) (the court granted the plaintiffs' request for declaratory relief but stayed imposition of any judicially crafted remedy to afford the legislature an opportunity to act); *Brigham v Vermont*, 166 Vt 246, 268; 692 A2d 384 (1997) (declaratory relief granted and jurisdiction retained until remedial legislation could be enacted); *McDuffy v Secretary of Executive Office of Ed*, 415 Mass 545; 615 NE2d 516 (1993); *Rose*, 790 SW2d at 215-216 (holding that the legislature failed to fulfill its constitutional duty to provide for an efficient system of public schools, but withholding finality of the decision until 90 days after the adjournment of the legislative session).[15]

---

[15] My colleagues suggest that the only available solution for these children is political, i.e., for the voters of Highland Park to elect a

I reject the majority's view that the possibility that such challenges might be faced if and when plaintiffs prove their case is grounds to not hear their case at all. It is the very rare case in which the judiciary is able to impose a perfect remedy: the issuance of a personal protection order does not automatically insulate an individual from further harassment, the imprisonment of a convicted murderer does not bring the victim back to life or heal the victim's loved ones, and civil judgments often fail to make the prevailing party whole. In sum, the role of the courts is to determine the rights of the parties under the rule of law and, based on that determination, fashion a reasonable, albeit often imperfect, remedy when the parties cannot agree on one. In that respect, this case is no different than many others that come before our courts.

At minimum, it is clear that a declaratory judgment[16] finding that the status quo is in violation of Const 1963, art 8, §§ 1 and 2, or MCL 380.1278(8), or both, or an injunction directing compliance with those laws, is well within the judiciary's purview. Indeed, such action, if merited, is required by our constitutional role as a check and balance on the other branches. As Justice

"better" school board. However, as the discussed cases demonstrate, even if the question of remedy is later found to exceed judicial capabilities, it is well within the purview of the judiciary to declare the status quo unlawful and refer the determination of remedy to the political branches.

[16] The majority opinion fails to substantively discuss plaintiffs' request for declaratory relief despite the fact that the trial court declined to dismiss the claim. The complaint and amended complaint each requested that this Court "[d]eclare unlawful Defendants' violation of Plaintiffs' rights as pursuant to MCL 380.1278(8)," "[d]eclare as unconstitutional Defendants' violation of Plaintiffs' rights under Article 8, §§ 1 and 2 of the Michigan Constitution," and "[d]eclare as unconstitutional Defendants' violations of Plaintiffs' rights under Article 1, § 2 of the Michigan Constitution[.]" I believe the majority's cursory treatment of this claim is insufficient to support its summary dismissal.

Hugo Black observed: "[T]he judiciary was made independent because it has . . . the primary responsibility and duty of giving force and effect to constitutional liberties and limitations upon the executive and legislative branches." Black, *The Bill of Rights*, 35 NYU L Rev 865, 870 (1960).

## V. CONCLUSION

My colleagues offer kindly worded sympathy to the children whose futures are in jeopardy through no fault of their own. But the schoolchildren who brought this claim are not requesting this Court's sympathy. They are asking that we allow their case to be heard.

The ultimate resolution of this case, if we were to allow it to be heard, cannot now be known. Defendants might prevail on the merits. The parties might agree on a remedy or, after trial, the trial court might impose a remedy from which none of the parties would appeal. Whether a remedy is imposed and, if so, whether it is proper, are questions that we should not, and may not, determine at this stage of the case. Most important, the mere existence of those questions should not lead us to refuse to hear the case altogether.

I wish to stress that I do not assert that this Court should now conclude that the state and school district are in violation of either statutory or constitutional standards. However, I do assert, consistent with precedent, that this is a justiciable matter, that plaintiffs have stated viable claims, and that the trial court, after hearing the relevant proofs, may render a decision subject to appellate review.

Accordingly, I respectfully dissent.